**Archie C. HAWKINSON, et al.,**
**Respondents (C5–83–1563),**
**Appellants (C2–83–1584),**

v.

**Theodore R. GEYER, et al., Appellants**
**(C5–83–1563), Respondents**
**(C2–83–1584).**

**Nos. C5–83–1563, C2–83–1584.**

Court of Appeals of Minnesota.

July 31, 1984.

Daniel A. Utter, Minneapolis, for respondents (C5–83–1563), appellants (C2–83–1584).

Bruce Elliott, Minneapolis, for appellants (C5–83–1563), respondents (C2–83–1584).

Heard, considered, and decided by FO-LEY, P.J. and SEDGWICK and RANDALL, JJ.

## OPINION

SEDGWICK, Judge.

Respondents-defendants Theodore Geyer and Gloria Vlcek (defendants) appeal from the denial of their motion for a new trial or remittitur. Appellants-plaintiffs Mr. Archie and Mrs. Sophie Hawkinson (plaintiffs) appeal from the trial court's order striking their claim for punitive damages. They also ask this court to modify the trial court's judgment to grant defendants credit only for that portion of their special damages that were covered by no-fault benefits. We affirm in part, reverse in part, and remand in part.

## FACTS

On November 20, 1981, defendants drove to Geyer's brother's home, which is less than a block from the plaintiffs' apartment, and drank from 9:30 a.m. until nearly 9 p.m.

Then they got into Geyer's car and Vlcek, an unlicensed driver, began speeding down Minnehaha Avenue swerving from curb to curb, driving across medians, down sidewalks, through the plaintiff's front yard and finally through the window and wall of plaintiff's garden level living room.

Vlcek's blood alcohol level after the accident was .28, nearly three times the .10 level established for drunk driving under Minnesota law.

Mr. and Mrs. Hawkinson, 78 and 68 respectively, were watching TV in their garden level apartment when defendants' car burst into their living room pinning Mr. Hawkinson to the wall and Mrs. Hawkinson under the car.

Both remained pinned for nearly 25 minutes while paramedic crews cut away walls and sifted through rubble to get to them. Mrs. Hawkinson was rushed by ambulance to Hennepin County Medical Center where she spent 10 touch-and-go days in intensive care and another 15 days under hospital care and observation.

She sustained 7 broken ribs, sprained her spine and right knee, and fractured her right clavicle. The sprain to her back and knee aggravated previous injuries. Mrs. Hawkinson's doctor diagnosed her person as being 25% permanently disabled.

As a result of the accident Mrs. Hawkinson's lung capacity is 57% of normal. Her deformed chest causes her great pain making her short of breath, and robbing her of her usual good humor.

Her right leg occasionally gives way because of the injury to her knee. Additionally, her shoulder injury restricts her ability to do even the simplest household chores.

Mr. Hawkinson also sustained injuries as a result of this accident. He bruised and cut his left foot, injured his right hip, bruised both arms, strained his chest and right knee. In addition, the accident aggravated neck and back injuries he sustained in a car accident in 1979.

None of Mr. Hawkinson's physical injuries are permanent, but doctors believe that his severe post-trauma stress disorder which has developed since the accident is permanent. The stress disorder manifests itself in sleeplessness, frequent nightmares, depression, bouts of crying, and almost constant worrying about his wife's weakened and fragile condition. Mr. Hawkinson must take medication to control it.

Defendants concede liability in this personal injury action. The case went to the jury solely on the damages issues. By special verdict the jury found Mr. Hawkinson's damages totaled $75,522.24, including special damages of $3,522.24, and Mrs. Hawkinsons's damages totaled $177,543.66, including special damages of $22,543.66.

Mr. Hawkinson received no-fault benefits of $912.13, and Mrs. Hawkinson received no-fault benefits of $1,666.10. The portion of the plaintiffs' special damages not covered by no-fault benefits was covered by medicare benefits.

Defendants moved for a new trial or remittitur, and for credit for all of plaintiffs special damages rather than only the amount of the plaintiffs' no-fault benefits. The court denied a new trial, but reduced the judgments for plaintiffs to $72,000 for Mr. Hawkinson and $155,000 for Mrs. Hawkinson, and granted defendants credit for all plaintiffs' special damages.

## ISSUES

1. Did the trial court err in denying defendant's motion for a new trial or remittitur?

2. Did plaintiffs' properly preserve their right to appeal the punitive damages issue?

3. Are plaintiffs entitled to claim punitive damages under Minnesota law?

4. When the jury finds that the plaintiffs are entitled to special damages, are defendants entitled to a credit in the amount of plaintiffs' medicare benefits?

## ANALYSIS

■ 1. An appellate court will not set aside a trial court's decision allowing a jury verdict to stand against a claim that the verdict is excessive, unless the trial court's exercise of its discretion allows an unreasonable verdict to stand. *DeWitt v. Schuhbauer*, 287 Minn. 279, 177 N.W.2d 790 (1970).

■■ There are no fixed standards by which this determination can be made. *Tuominen v. Waldholm*, 301 Minn. 492, 493, 221 N.W.2d 709, 710 (1974). A jury's award cannot be justified or discredited by comparison to other verdicts. *Stenzel v. Bach*, 295 Minn. 257, 203 N.W.2d 819 (1973); *Ahranholz v. Hennepin County*, 295 N.W.2d 645 (Minn.1980).

■ Defendants argue that Mr. Hawkinson's injuries are not significant or permanent. They contend that Mr. Hawkinson's testimony attributing the pain in his knee and lower back area to this accident, rather than an earlier accident, must be rejected in light of *Rehnke v. Jammes*, 283 Minn. 431, 435, 168 N.W.2d 494, 497 (1969).

*Rehnke* held that where plaintiff was involved in two rear-end collisions within a two-month period, and it was the medical testimony of both parties that the first tortfeasor caused permanent injury which the second tortfeasor aggravated, it was error to submit the issue of permanent injury with respect to the second tortfeasor to the jury and permit the jury to exonerate the first tortfeasor.

*Rehnke* is factually distinguishable. First, the permanency of Mr. Hawkinson's knee and back injuries from the first car accident was not determined. Secondly, the accidents in *Rehnke* were only 2 months apart, not nearly 2½ years apart as is the case here.

Although Mr. Hawkinson had injured his knee and lower back in the 1979 accident and continued to receive treatment for these injuries, the evidence clearly establishes that he had resumed many of the activities he enjoyed before the 1979 accident by the time `of the 1981 accident.

The evidence leaves no doubt that his personality and lifestyle changed as a result of the injuries suffered in the 1981 accident. Considering all of Mr. Hawkinson's injuries resulting from this accident we find the jury was justified in assessing $72,000 for his past and future suffering.

■■ Mrs. Hawkinson is unquestionably significantly and permanently disabled as a result of the second accident. For defendants to argue that she is largely recovered and only experiences intermittent mild pain is untenable.

She lived through a terrible month in the hospital and spent another two months totally bedridden. For months after that she was so weak she could not even prepare meals at home. Leaving the house was impossible.

There is ample evidence showing her changed lifestyle due to the injuries she suffered in the 1981 accident. Before the accident Mrs. Hawkinson was not the picture of perpetual health; she had sleeping problems; had a bout with cancer; and had occasional back problems. But she was not

the debilitated person she is today and will be for the rest of her life as a result of this accident. Therefore, we affirm the damage award.

2. Defendants contend that the procedural posture of plaintiffs' appeal does not permit appellate review of the trial court's grant of a partial summary judgment for defendants on the issue of punitive damages. Defendants claim this issue is non-reviewable because plaintiffs did not identify the subsection of Rule 103.-03 of the Rules of Appellate Procedure authorizing review, as required by *Fladland v. Northway Constr., Inc.*, 343 N.W.2d 687 (Minn.Ct.App.1984).

*Fladland* is distinguishable. Fladland attempted to appeal from an order for judgment, rather than the subsequently entered final judgment. Here, appellants-plaintiffs appeal from a properly entered judgment which included the court's decision to remove the issue of punitive damages from jury consideration. Therefore, pursuant to Rule 103.04, Minn.R.Civ.App., the issue is properly before us.

3. The next issue is whether, under these circumstances, the award of punitive damages is an appropriate sanction for the operation of a car while under the influence of alcohol. This is an issue of first impression to Minnesota Courts.

A majority of the states that have addressed this issue support the view that driving while intoxicated is in itself sufficiently reckless or wanton to warrant punitive damages. *See, Intoxication of Automobile Driver as Basis for Awarding Punitive Damages*, 65 A.L.R.3d 656 (1975).

Those few courts which deny punitive damages as a matter of law in cases involving intoxicated drivers have been governed by a standard for punitive damages requiring actual malice. These courts have required "that state of mind under which a person's conduct is characterized by hatred, or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other persons." *Detling v. Chockley*, 70 Ohio St.2d 134, 436 N.E.2d

208 at 211 (1982). Actual malice as defined in *Detling* is not required for an award of punitive damages in Minnesota.

Minn.Stat. § 549.20, Subd. 1 (1982), provides that punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

States with similar standards for the award of punitive damages that have addressed the issue have almost universally allowed such damages in cases involving drunk drivers.

In *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838 (2nd Cir.1967), the court defended the application of punitive damages to a drunk driver:

> From a moral standpoint there is not too much difference between the driver who heads his car into a plaintiff and the driver who takes the wheel knowing himself to be so drunk that he probably will hit someone and not caring whether he does or not; and it is as important to deter the latter type of conduct as the former.

Here, the defendants drank all day knowing they would drive their car later in the day. When they entered the car they knew they were extremely intoxicated. Under these conditions they must have known that their intoxication would create a serious risk to the safety of others.

Although the Minnesota Legislature has not expressly approved punitive damage awards in cases involving drunk drivers, the recent emphasis in the legislature on more effective enforcement measures against drunk drivers indicates a commitment to deter such conduct by all possible means.

We review the grant of summary judgment on the punitive damage issue in the light most favorable to the non-moving party, the defendants, and find the evidence sufficient to sustain the claim that defendants acted with "wilful indifference to the rights or safety of others," entitling plaintiffs to have the issue of punitive dam-

ages submitted to a jury. Minn.Stat. § 549.20 (1982).

 4. Finally, defendants contend that they are entitled to a credit for plaintiffs' medicare benefits against the special damages.

Minn.Stat. § 65B.51, subd. 1 (1982) of the Minnesota No-Fault Insurance Act provides in pertinent part:

> With respect to a cause of action in negligence accruing as a result of injury arising out of the operation, ... of a motor vehicle ... there shall be deducted from any recovery the value of basic or optional economic loss benefits paid or payable,
> ....

The issue is whether the purpose of this section prevents plaintiffs from double recovery of "basic economic loss benefits" from any source, or only from two different no-fault carriers.

*Hueper v. Goodrich*, 314 N.W.2d 828 (Minn.1982), indicates that the latter is the purpose of this section. However, the Minnesota Supreme Court has not directly ruled on the issue of whether medicare is a collateral source.

In *Hueper*, a minor received free medical treatment from a Shriner's Hospital. The jury awarded $37,000 to Hueper for his son's hospital and medical care. The value of those services was $25,000. The hospital was a charitable organization which would not accept payment for services provided.

In light of this, defendant Goodrich requested the trial court to reduce Hueper's recovery by the amount of the value of the services, $25,000. The court found that the collateral source rule allowed Hueper to recover the reasonable value of the medical care provided, even though that care had been provided free of charge. In so ruling the court explained the collateral source rule:

> Under the collateral source rule, a plaintiff may recover damages from a tortfeasor, although the plaintiff has received money or services in reparation of the injury from a source other than the tortfeasor. (cite omitted) ... The rule has been applied where the plaintiff has received insurance proceeds, employment benefits, gifts of money or medical services, welfare benefits or tax advantages. (cite omitted).

The court explained that to begin limiting the application of the rule is to invite an unlimited flow of litigation seeking ad hoc determinations with the confusion that would necessarily follow.

"Considering the rule in its broadest sense and reviewing all of the considerations involved in such an evaluation, we decline to abandon the collateral source rule or to create limitations on its application." 314 N.W.2d at 831.

Applying the rule in its broadest sense, we refuse to create a Medicare limitation to the rule under these facts.

### DECISION

We affirm the trial court's decision regarding compensatory damages and credit for no-fault insurance benefits, and reverse and remand for trial on punitive damages.